U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED
2011 APR 11 A 10:58
JON A. SANFILIPPO
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                    Case No. **11-CR-80**

RICKEY I. KANTER,

Defendant.

## PLEA AGREEMENT

1.    The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Matthew L. Jacobs, Assistant United States Attorney, and the defendant, Rickey I. Kanter, individually and by his attorney, Patrick J. Knight, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant will be charged in a one-count criminal information that will be filed in conjunction with this plea agreement. The information charges the defendant with using commercial interstate carriers to carry out a scheme to defraud, in violation of Title 18, United States Code, Section 1341.

3.    The defendant has read and fully understands the charge contained in the information and fully understands the nature and elements of the crime with which he has been charged. Further,

these charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to waive in open court his right to have this matter prosecuted by indictment.

5. The defendant voluntarily agrees to plead guilty to the charge contained in the information, which are set forth below.

### THE UNITED STATES ATTORNEY CHARGES:

1. Beginning by at least January 2006 and continuing thereafter until approximately March 2006, in the State and Eastern District of Wisconsin, and elsewhere,

### RICKEY I. KANTER

devised and carried out a scheme to defraud and to obtain money by means of material false and fraudulent pretenses and representations (the "scheme"), which scheme is more fully described below.

2. Kanter's scheme included a scheme to defraud the Medicare Program, which paid for a majority of the inserts sold by Dr. Comfort.

3. One of the objectives of Kanter's scheme was to market and sell inserts for therapeutic shoes by falsely representing that the inserts qualified to be paid for by Medicare.

4. For purposes of executing the scheme, Kanter used and caused the use of the United States mail and commercial interstate carriers.

#### Defendant and relevant parties

5. At all times material:

a. Defendant Rickey I. Kanter ("Kanter") was a resident of Mequon, Wisconsin and was the majority owner, and chief executive officer of Rikco International, LLC.

b. Rikco International, LLC was a Wisconsin limited liability company, doing business as Dr. Comfort (hereinafter referred to as "Dr. Comfort"), with its principal place of business located in Mequon, Wisconsin.

2

c. Dr. Comfort manufactured, marketed and sold therapeutic shoes and inserts for therapeutic shoes that were intended for use primarily by individuals with diabetes and severe foot disease.

d. Dr. Comfort marketed and sold therapeutic shoes and inserts primarily to podiatrists, who, in turn, sold the shoes and inserts to individual consumers. The majority of therapeutic shoes and inserts sold by Dr. Comfort were ultimately billed to and paid for by the Medicare Program.

e. Sen Tang Huang ("Huang"), who is known as "Scott," was a Chinese citizen who worked with Kanter to design and produce therapeutic shoes and inserts using manufacturers in China.

## The Medicare Program

6. The Medicare Program was and is a federally subsidized and administered health insurance program for persons who are age 65 or older, and certain individuals who are disabled. In this indictment, the federal agencies, contractors, and entities through which the Medicare Program was administered and operated are collectively referred to as Medicare.

7. Under appropriate circumstances, Medicare paid for certain therapeutic shoes and inserts for qualifying Medicare beneficiaries with diabetes who had severe foot disease. As is relevant here, Medicare would only pay for prefabricated inserts if they could be molded after heating and formed to a patient's foot to maintain total contact with the foot.

8. In January 2004, Medicare issued new requirements concerning the circumstances under which it would pay for inserts. Under these requirements, Medicare would only pay for heat-moldable inserts if the base layer of the inserts met specific minimum thickness and hardness standards. These requirements became effective July 1, 2004.

9. To facilitate compliance with these new requirements, Medicare encouraged manufacturers and suppliers to submit samples of their inserts to Medicare to verify that the inserts satisfied the new standards.

10. Under this review procedure, Medicare evaluated inserts to determine whether they met the minimum thickness and hardness requirements. Based on this evaluation, Medicare assigned a specific billing code indicating whether the inserts met or failed Medicare's requirements and, therefore, whether Medicare would pay for the inserts.

## Scheme to Defraud

11. Kanter's scheme to defraud and to obtain money by means of material false and fraudulent pretenses and representations was essentially as follows:

3

a. In April 2004, Dr. Comfort sought verification from Medicare that two models of heat-moldable inserts it intended to sell met Medicare's new standards. One of the models was called an "Elite XtraS" insert. Dr. Comfort provided Medicare with samples of the inserts, as well as a description of the materials and manufacturing process for them.

b. Medicare determined that the base layer of Dr. Comfort's inserts were too thin to meet Medicare's new standards and, therefore, assigned the inserts a billing code indicating Medicare would not pay for them. On June 14, 2004, Medicare notified Dr. Comfort of this decision.

c. Beginning on July 1, 2004, and despite being informed that its inserts failed to meet Medicare's standards, Dr. Comfort marketed and sold the rejected Elite Xtras inserts and falsely and fraudulently represented that the inserts were "Medicare Covered" and eligible for payment by Medicare.

d. On July 1, 2004, Dr. Comfort asked Medicare to review its decision concerning its Elite XtraS inserts. Dr. Comfort falsely represented to Medicare that the sample inserts it had initially submitted were "pre-production samples."

e. Dr. Comfort also submitted revised samples of the Elite XtraS inserts that had a thicker base layer, as well as a revised description of the materials and manufacturing process for the inserts.

f. Medicare determined that the revised insert samples satisfied Medicare's requirements and, therefore, assigned them a billing code indicating Medicare would pay for them. On September 20, 2006, Medicare notified Dr. Comfort of this decision.

g. Dr. Comfort, however, did not sell the revised inserts approved by Medicare. Instead, Dr. Comfort continued to sell the inserts Medicare rejected.

h. Relying on the approval it obtained from Medicare, Dr. Comfort marketed the rejected inserts as "Medicare covered."

I. Dr. Comfort also provided customers with instructions on how to bill Medicare for the inserts even though the inserts did not meet Medicare's standards.

j. In January 2006, Dr. Comfort's Chief Operating Officer resigned after informing Kanter and lawyers for Dr. Comfort that Dr. Comfort had been

4

selling heat-moldable inserts that did not comply with Medicare's standards
to be eligible for payment.

k. Despite being advised by his lawyers to stop selling non-compliant inserts,
Kanter continued to market and sell heat-moldable inserts that failed to
comply with Medicare's requirements and falsely represented that the inserts
were "Medicare covered" and eligible for payment by Medicare.

l. Kanter represented to his lawyers and other third parties that Dr. Comfort
had stopped selling non-compliant inserts in January 2006.

m. During January and February 2006, Kanter worked with Huang to design
a new version of heat-moldable inserts to replace the non-compliant inserts
Dr. Comfort was selling. The new inserts designed by Kanter and Huang had
a thicker base layer to meet Medicare's requirements. Kanter and Huang,
however, reduced the thickness of the top layer of the new inserts so that the
overall thickness of the new inserts would be less than the inserts submitted
to and approved by Medicare.

n. On March 23, 2006, federal agents executed search warrants at the
business premises of Dr. Comfort located in Mequon, Wisconsin. Federal
agents located and seized thousands of inserts at Dr. Comfort that failed to
meet Medicare's requirements to be eligible for payment.

o. On or about March 28, 2006, Kanter spoke to Huang and discussed
possible explanations why Dr. Comfort had marketed and sold inserts that
failed to comply with Medicare's requirements.

p. On or about March 29, 2006, and at Kanter's direction, Huang had a
telephone conversation with his wife. During this conversation, Huang
instructed his wife to obtain a letter from the manufacturer of the inserts sold
by Dr. Comfort providing an explanation as to why Dr. Comfort had
marketed and sold inserts that failed to comply with Medicare's requirements.

q. On or about August 3, 2006, Kanter, through counsel, provided the United
States Attorney's office with a letter, which was in Chinese, as well as a
translation of the letter into English. The letter, which purported to be from
the Chinese manufacturer of the inserts sold by Dr. Comfort, represents that
in October 2005, the manufacturer moved its factory, at which time the molds
used to produce the inserts were "carelessly mixed."

5

r. On or about June 10, 2008, Kanter, through counsel, provided the United States Attorney's Office and federal investigators additional information concerning the circumstances under which Dr. Comfort received non-compliant inserts.

s. According to this additional information, in approximately December 2004, the insert manufacturer had moved its production facility and that, during the move, the molds used to produce the inserts had been mixed up. As a result of this confusion, the manufacturer inadvertently produced inserts using the molds for the original inserts submitted to Medicare that had been rejected.

t. On or about August 2008, Kanter, through counsel, again provided additional information to federal agents and representatives of the United States Attorney's Office concerning the circumstances under which Dr. Comfort received non-compliant inserts.

12. As a result of Kanter's scheme, Dr. Comfort received approximately $375,000 in payments for non-compliant inserts it sold during the period January 2006 through March 2006 that were billed to and paid for by Medicare.

### Shipment in furtherance of the scheme

13. On or about March 7, 2006, in the State and Eastern District of Wisconsin, and elsewhere,

### RICKEY I. KANTER,

for the purpose of carrying out his scheme and attempting to do so, shipped by commercial interstate carrier a package containing heat-moldable inserts from Mequon, Wisconsin, to a podiatrist in Bradenton, Florida. The podiatrist provided the inserts to a patient and billed the cost of the inserts to Medicare, which paid for them. As Kanter well knew, the inserts did not meet Medicare's standards to be eligible for payment.

All in violation of Title 18, United States Code, Section 1341.

6. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the

offense charged in the information. The parties acknowledge and understand that if this case were

to proceed to trial, the government would be able to prove the following facts beyond a reasonable

6

doubt. The defendant admits to the following facts and that these facts establish his guilt beyond a

reasonable doubt:

At all times relevant, Rickey I. Kanter ("Kanter") was a resident of Mequon, Wisconsin and was the owner, operator, and chief executive officer of Rikco International, LLC. Rikco International, LLC was a Wisconsin limited liability company, doing business as Dr. Comfort (hereinafter referred to as "Dr. Comfort"), with its principal place of business located in Mequon, Wisconsin. Dr. Comfort manufactured, marketed and sold therapeutic shoes and inserts for therapeutic shoes that were intended for use primarily by individuals with diabetes and severe foot disease. Dr. Comfort marketed and sold therapeutic shoes and inserts primarily to podiatrists, who, in turn, sold the shoes and inserts to individual consumers. The majority of therapeutic shoes and inserts sold by Dr. Comfort were ultimately billed to and paid for by the Medicare Program.

Sen Tang Huang ("Huang"), who is also known as "Scott," is a Chinese citizen who served as Dr. Comfort's primary contact with and communicator to the manufacturing and design companies in China that created Dr. Comfort therapeutic shoes and inserts.

Medicare Program was and is a federally subsidized and administered health insurance program for persons who are age 65 or older, and certain individuals who are disabled. In this indictment, the federal agencies, contractors, and entities through which the Medicare Program was administered and operated are collectively referred to as Medicare. Under appropriate circumstances, Medicare paid for certain therapeutic shoes and inserts for qualifying Medicare beneficiaries with diabetes who had severe foot disease. As is relevant here, Medicare would only pay for prefabricated inserts if they could be molded after heating and formed to a patient's foot to maintain total contact with the foot.

In January 2004, Medicare issued new requirements concerning the circumstances under which it would pay for inserts. Under these requirements, Medicare would only pay for heat-moldable inserts if the base layer of the inserts met specific minimum thickness and hardness standards. These requirements became effective July 1, 2004.

To facilitate compliance with these new requirements, Medicare encouraged manufacturers and suppliers to submit samples of their inserts to Medicare to verify that the inserts satisfied the new standards. Under this review procedure, Medicare evaluated inserts to determine whether they met the minimum thickness and hardness requirements. Based on this evaluation, Medicare assigned a specific billing code indicating whether the inserts met or failed Medicare's requirements and, therefore, whether Medicare would pay for the inserts.

In April 2004, Dr. Comfort sought verification from Medicare that two models of heat-moldable inserts it intended to sell met Medicare's new standards. One of the models was called an "Elite XtraS" insert. Dr. Comfort provided Medicare with samples of the inserts, as well as a description of the materials and manufacturing process for them. Medicare determined that the base

7

layer of Dr. Comfort's inserts were too thin to meet Medicare's new standards and, therefore, assigned the inserts a billing code indicating Medicare would not pay for them. On June 14, 2004, Medicare notified Dr. Comfort of this decision.

Beginning on July 1, 2004, and despite being informed that its inserts failed to meet Medicare's standards, Dr. Comfort marketed and sold the rejected Elite Xtras inserts and falsely and fraudulently represented that the inserts were "Medicare Covered" and eligible for payment by Medicare. On July 1, 2004, Dr. Comfort asked Medicare to review its decision concerning its Elite XtraS inserts. Dr. Comfort falsely represented to Medicare that the sample inserts it had initially submitted were "pre-production samples." Dr. Comfort also submitted revised samples of the Elite XtraS inserts that had a thicker base layer, as well as a revised description of the materials and manufacturing process for the inserts.

Medicare determined that the revised insert samples satisfied Medicare's requirements and, therefore, assigned them a billing code indicating Medicare would pay for them. On September 20, 2004, Medicare notified Dr. Comfort of this decision. Dr. Comfort, however, did not sell the revised inserts approved by Medicare. Instead, Dr. Comfort continued to sell the inserts that had not been approved by Medicare. Relying on the approval it obtained from Medicare, Dr. Comfort marketed the non-approved inserts as "Medicare covered." Dr. Comfort also provided customers with instructions on how to bill Medicare for the inserts even though the inserts did not meet Medicare's standards.

On or about January 10, 2006, Dr. Comfort's Chief Operating Officer ("COO") resigned. In connection with his resignation, the COO informed Kanter and lawyers for Dr. Comfort that Dr. Comfort had been selling heat-moldable inserts that did not comply with Medicare's standards to be eligible for payment.

Despite being advised by his lawyers to stop selling the non-compliant inserts, Kanter continued to market and sell heat-moldable inserts that failed to comply with Medicare's requirements Dr. Comfort continued to represent that the inserts were "Medicare covered" and eligible for payment by Medicare.

During January and February 2006, Kanter worked with Huang, who was in federal custody, to design a new version of heat-moldable inserts to replace the non-compliant inserts Dr. Comfort continued to sell. The new insert designed by Kanter and Huang had a thicker base layer to meet Medicare's requirements. Kanter and Huang, however, reduced the thickness of the top layer of the new inserts. As a result, the overall thickness of the new inserts was less than the inserts submitted to and approved by Medicare. These new inserts were not received by Dr. Comfort until March 17, 2006. In the interim, Dr. Comfort continued to sell non-compliant inserts.

On March 23, 2006, federal agents executed search warrants at the business premises of Dr. Comfort located in Mequon, Wisconsin. Federal agents located and seized thousands of inserts at Dr. Comfort that failed to meet Medicare's requirements to be eligible for payment.

8

Shortly after the search, Kanter spoke to Huang and discussed why Dr. Comfort had marketed and sold inserts that failed to comply with Medicare's requirements. On or about March 29, 2006, Huang contacted his wife, who was in China, by telephone. During this conversation, Huang asked his wife to obtain a letter from the manufacturer of the inserts sold by Dr. Comfort providing an explanation as to why Dr. Comfort had marketed and sold inserts that failed to comply with Medicare's requirements.

At the request of Huang's wife, the Chinese manufacturer provided a letter advising that in October 2005, the manufacturer moved it's factory and molds used to produce the inserts were "carelessly mixed." On or about August 3, 2006, counsel for Kanter provided a copy of that letter to the United States Attorneys Office.

Throughout 2007 and 2008, counsel for Kanter conducted an investigation of the Chinese manufacturer of inserts for Dr. Comfort. Counsel and investigators conducted telephone interviews and went to China to meet with representatives of the manufacturer and obtain records relevant to the heat moldable inserts shipped during the subject time period. According to the representatives of the manufacturer, several different insert molds had been designed and that the manufacturer may have mixed molds during a move of the factory that occurred in approximately December 2004. Counsel, however, did not locate any molds, or other documentation such as blueprints for molds, consistent with the inserts that Dr. Comfort submitted to Medicare in 2004 that were ultimately approved.

The results of that investigation were provided to the United States Attorneys Office by Kanter's counsel at various times in 2008.

As a result of Kanter's scheme, Dr. Comfort received approximately $375,000 in payment for non-compliant inserts it sold during the period January 2006 through March 2006 that were billed to and paid for by Medicare.

The specific charge to which Kanter will plead guilty is base on a shipment of non-compliant heat-moldable inserts that were shipped by Dr. Comfort on March 7, 2006, to a podiatrist in Bradenton, Florida using a commercial interstate carrier. The inserts, which Kanter knew did not meet Medicare's standards, were nonetheless billed to and paid for by Medicare.

This information is provided for the purpose of setting forth a factual basis for the defendant's plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in this offense.

9

## PENALTIES

7. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: Twenty (20) years and $250,000. The charge also carries a mandatory special assessment of $100.00, and a maximum of five years of supervised release to follow any term of confinement.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes, as well as the applicable sentencing guidelines, with his attorney.

## ELEMENTS

9. The parties understand and agree that to sustain the charge of using a commercial interstate carrier to carry out a scheme to defraud, in violation of Title 18, United States Code, Section 1341, as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the defendant knowingly devised or participated in the scheme to defraud or to obtain money by means of materially false pretenses, representations or promises, as described in of the indictment;

Second, that the defendant did so knowingly and with the intent to defraud; and

Third, that for the purpose of carrying out the scheme or attempting to do so, the defendant used or caused the use of the United States Mails or a private or commercial interstate carrier in the manner charged.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

10

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense charged in the information. The defendant acknowledges and agrees that his attorney, in turn, has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that, prior to sentencing, the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty plea solely as a result of the sentencing court's determination of defendant's criminal history.

## Sentencing Guidelines Calculations

14. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

11

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which defendant is pleading guilty.

16. The parties agree to recommend to the sentencing court that the loss amount that the court should use in determining the defendant's offense level is $375,000, which represented the amount money Dr. Comfort received in payments for non-compliant inserts it sold during the period January 2006 through March 2006 that were billed to and paid for by Medicare.

## Base Offense Level

17. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense to which the defendant will plead guilty is 7, as determined under Sentencing Guidelines Manual § 2B1.1(a)(10).

## Specific Offense Characteristics

18. The parties agree to recommend to the sentencing court that, pursuant to § 2S1.1(b)(2)(G), the defendant's offense level for the offense to which he will plead guilty should be increased 12 levels because the loss amount associated with the defendant's conduct is more than $200,000 but less than $400,000.

19. The defendant acknowledges that the government has reserved the right to recommend to the sentencing court that, pursuant to Sentencing Guideline Manual § 3C1.1, the defendant's offense level should be increased 2 levels for attempting to obstruct and impede the administration of justice with the respect to the government's investigation based on the defendant's

12

actions after federal agents search the business premises of Dr. Comfort of March 23, 2006. The defendant has reserved the right to argue against this increase.

## Acceptance of Responsibility

20.    The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

21.    Both parties reserve the right to apprise the district court and the probation office of any and all information that might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense, as well as any and all matters that might constitute aggravating or mitigating sentencing factors.

22.    The parties acknowledge that the government has agreed to recommend a sentence of imprisonment for a period of 18 months. The defendant has reserved the right to recommend a lower sentence.

## Court's Determinations at Sentencing

23.    The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court

13

will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

### Special Assessment

26. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## DEFENDANT'S WAIVER OF RIGHTS

27. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

> a. If the defendant persisted in a plea of not guilty to the charge against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

14

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

28. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

29. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

15

30. The defendant knowingly and voluntarily waives all claims he may have based upon the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

31. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

## Further Civil or Administrative Action

32. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

33. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

16

34. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

35. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of his conviction.

## Further Action by Internal Revenue Service

36. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charge alleged in the information.

37. The defendant agrees to transmit the original records, or copies thereof, which he has in his possession or under his control, to the Examination Division of the Internal Revenue Service so that the Examination Division of the Internal Revenue Service can complete a civil audit of the defendant. The defendant agrees to provide any additional books and records he has in his possession or under his control which may be helpful to the Examination Division of the Internal Revenue Service to complete its civil audit of defendant.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

38. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate

17

any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

39. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

18

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 2/24/2011

RICKEY I. KANTER
Defendant

I am the defendant's attorney. I have carefully reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 2/24/11

PATRICK J. KNIGHT
Attorney for Defendant

For the United States of America:

Date: 4/8/11

JAMES L. SANTELLE
United States Attorney

Date: April 8, 2011

MATTHEW L. JACOBS
Assistant United States Attorney

19